# 2006 DTA 64

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**
**PANEL II**

EX-TNTE. MANUEL BATISTA RODRÍGUEZ
PLACA NUM. 6-12549
Recurrente

v.

POLICÍA DE PUERTO RICO
Recurrida

Núm. KLRA-04-00561

San Juan, Puerto Rico, a 29 de marzo de 2006

Panel integrado por su Presidenta, la Juez Bajandas Vélez,
y los Jueces Aponte Hernández y González Vargas

Bajandas Vélez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos el Sr. Manuel Batista Rodríguez (el recurrente o el Sr. Batista) mediante el recurso de epígrafe. Nos solicita que revoquemos la resolución emitida por la Comisión de Investigación, Procesamiento y Apelación (la CIPA) el 30 de marzo de 2004 y notificada el 18 de mayo de igual año. A través de la misma, la CIPA confirmó la decisión tomada por el Superintendente de la Policía de Puerto Rico (la Policía o la recurrida) de expulsar al Sr. Batista de dicho cuerpo, por haber incurrido en actos constitutivos de hostigamiento sexual hacia una subalterna.

Examinados los escritos de las partes y el derecho aplicable, resolvemos confirmar la resolución recurrida.

## I

El 17 de mayo de 2001, la Policía le notificó al Sr. Batista su intención de expulsarlo por haber incurrido en violaciones al Reglamento de Personal de dicho cuerpo. En esta comunicación, la recurrida señaló lo siguiente:

La Policía de Puerto Rico realizó una investigación administrativa relacionada con su conducta como miembro de la Fuerza.

Surge de la investigación que el 6 de noviembre de 1998, aproximadamente a las 8:20 a.m. la Agte. Dina I. Bauzá Colón 20270, adscrita en ese momento al Precinto 258, Playa de Ponce, el cual usted comandaba, le preguntó a usted si podía utilizar pantalones para el servicio en la calle. Usted le contestó que sí, pero que no fueran ajustados ni apretados porque lo de usted no se exhibía, ya que usted era celoso.

El 9 de noviembre de 1998, aproximadamente a las 8:15 a.m., usted le pidió a la Agte. Bauzá Colón 20270 que llamara al residencial Arístides Chavier, relacionado con unos horarios suyos. Usted le pidió que llamara por teléfono de su oficina. La Agte. Bauzá Colón se trasladó a su oficina. Allí usted le expresó: "*Me siento como Igor González con mi propia Olga Tañón*", mientras al mismo tiempo usted le miraba el trasero y se pasaba la lengua alrededor de los labios.

El 30 de noviembre de 1998, usted le preguntó a la Agte. Bauzá Colón 20270 cómo se estaba portando. Ella le contestó que bien. Usted le dijo a la Agte. Bauzá Colón 20270: "*Si te vas a comportar mal acuérdate de mí porque quiero ser el primero en estar contigo y ponerte a gozar*".

El 18 de diciembre de 1998 aproximadamente a las 8:30 a.m. en su oficina, usted le dijo a la Agte. Bauzá Colón 20270: "*Bueno dime que esperas para el próximo año*". La Agte. Bauzó Colón 20270 le dijo: "*Muchas cosas buenas*". Usted le dijo: "*Yo espero comprarme un apartamento donde pueda estar con un nuevo amor como tú que eres como una muñeca Barbie*". Mientras usted le decía esto le miraba fijamente las partes íntimas.

El 25 de octubre de 1999 aproximadamente a las 4:00 p.m. estando la Agte. Bauzá Colón 20270 frente al retén, usted pasó por detrás de ella y le rozó bruscamente los glúteos con su parte frontal y su miembro genital erecto. Usted también con su mano derecha le apretó los glúteos. Esto sucedió en presencia del Agte. Juan Antonio Pacheco Torres 20181.

En otra ocasión la Agte. Bauzá Colón se encontraba en el estacionamiento del Cuartel y usted se le acercó. Usted le dijo: *"Ah, Bauzá ¿tú no sabes de una costurera?, porque me queda ancho el pantalón"* a la vez que usted se agarraba los genitales. La Agte. Bauzá Colón se montó en la patrulla y se fue.

Los hechos antes reseñados constituyen una violación al Artículo 14, Sección 14.5, Faltas Graves Número 1, 27 y 40 (d) del Reglamento de Personal de la Policía de Puerto Rico, que dispone lo siguiente:

*"Falta Grave Núm. 1 Demostrar incapacidad manifiesta, ineptitud, descuido, parcialidad o negligencia en el desempeño de sus deberes, funciones y responsabilidades.*

*Falta Grave Núm. 27 Observar una conducta lesiva, inmoral o desordenada en detrimento del Cuerpo de la Policía.*

*Falta Grave Núm. 40 (d) Incurrir en mal uso o abuso de autoridad, entendiéndose como actos de mal uso o abuso de autoridad los siguientes:*

*d. Discrimen por razones políticas, religiosas, condición socio-económicas, o cualesquiera otras razones no aplicables a todas las personas en general."*

Por las razones antes expuestas, me propongo expulsarlo del puesto que ocupa en la Policía de Puerto Rico.

De acuerdo a las advertencias incluidas en dicha comunicación, el recurrente solicitó la celebración de una vista informal ante un oficial examinador, la cual se llevó a cabo los días 14, 20 y 27 de noviembre de 2001.

El 26 de marzo de 2002, el Superintendente de la Policía le notificó al recurrente que *"luego de evaluar el expediente admininistrativo [había] determinado que la sanción anunciada en la Resolución de Cargos debe ser confirmada"*. ▮ En consecuencia, expulsó al Sr. Batista de la Policía.

Oportunamente, el Sr. Batista presentó una apelación ante la CIPA. En ésta alegó que la determinación de la Policía fue contraria a hecho y derecho. La vista administrativa en el caso de autos se llevó a cabo de manera fraccionada. El 10 de junio de 2003, la vista fue presidida por la Comisionada Lcda. Migdalia López (la Lcda. López) y el 11 de junio de 2003, la vista fue dirigida por la Lcda. López y los Comisionados, Lcdo. Giménez Muñoz y el Lcdo. Martínez. Por su parte, el 14, 15, 20, 21 de enero y 11 de marzo de 2004, la vista fue dirigida por los Comisionados Lcdo. José E. Hernández, el Lcdo. Tomás Torres y el Lcdo. Pedro R. Cintrón.

En los primeros dos días de vista, la recurrida presentó los testimonios de ocho (8) testigos entre los que se encontraban la Agente Dina Bauzó (la Agte. Bauzó), el Agente Juan A. Pacheco Torres (el Agente Pacheco) y la Agente Iris Vanesa Rodríguez (la Agte. Rodríguez). En el resto de los días, el recurrente presentó los testimonios de 21 testigos los que se encontraban el Capitán Víctor Colón Rivera (el Capitán Colón), el Sargento Héctor Torres González (el Sgto. Torres), el Sr. Jasón Vega Vega (el Sr. Vega), el Agente Norman Torres Ramos (el Agte. Torres), la Agte. Clara Feliciano (la Agte. Feliciano) y el Agente Oscar Fernández (el Agte. Fernández). El Sr. Batista no prestó testimonio alguno.

El 30 de marzo de 2004, la CIPA emitió la resolución recurrida. En la misma, determinó lo siguiente:

"La prueba vertida ante nos, recoge varias instancias en las que el apelante hizo insinuaciones a su subalterna de alto contenido sexual. En adición, el apelante incurrió en un acto de agresión física de índole sexual cuando intencionalmente rozó sus nalgas con el órgano genital erecto. Esta conducta tuvo el efecto de consumar comportamiento sexual altamente ofensivo y crear un ambiente de trabajo intimidante y hostil para la agente Bauzá. Surge de la prueba que la víctima se sintió intimidada al grado que le manifestó a una compañera que el rango del apelante la disuadía de dialogar con él sobre cómo le afectaba su conducta. También quedó claramente establecido que la reacción de la víctima a los avances en cuestión fue de rechazo desde sus inicios al punto que un testigo ocular, el agente Pacheco, intervino para evitar que el incidente tuviera mayores consecuencias.

Somos del criterio que los eventos constitutitos [sic] de la conducta hostigante del aquí apelante causaron un grado tal de ansiedad y debilitamiento de la estima y confianza de la agente Bauzá que contaminaron sus condiciones de empleo. [Citas omitidas].

Siendo el hostigamiento sexual un discrimen por razón de sexo contemplado como acto de mal uso y abuso de autoridad punible bajo la Falta Grave 40 del Reglamento de Personal contaba la autoridad nominadora con facultad para expulsar al apelante del Cuerpo de la Policía. [Citas omitidas]." ■

Inconforme, el Sr. Batista presentó el recurso de epígrafe, acompañado, entre otros documentos, de una transcripción de los testimonios vertidos en la vista administrativa. Señaló los siguientes errores:

"Erró la Comisión de Investigación, Procesamiento y Apelación al fraccionar la vista en apelación del presente caso y fraccionada que fuera la misma esto tuvo el efecto adverso para el apelante-recurrente de que recibiera una comisión constituida por tres (3) miembros distintos a los que presidieron la continuación de vista donde se recibió la prueba de la parte apelante-recurrente.

Erró la Comisión de Investigación, Procesamiento y Apelación al recibir dos (2) comisiones totalmente distintas una de otra, prueba conflictiva entre sí, al extremo que prácticamente la prueba vertida ante la última comisión era impugnando y refutando la prueba ofrecida ante la primer [sic] comisión y para lo mismo se utilizó prueba testifical y documental que no desfiló ante la primer [sic] comisión.

Erró la Comisión de Investigación, Procesamiento y Apelación en su determinación de confirmar en el presente caso la decisión de la Policía de Puerto Rico, toda vez que el proceso que se llevó ante la comisión fue uno irrazonable, ilegal y mediando abuso de discresión [sic], al extremo que afectó sustancialmente derechos fundamentales del apelante-recurrente al negársele su derecho a un debido proceso de ley.

Erró la Comisión de Investigación, Procesamiento y Apelación al dictar una resolución confirmando la decisión apelada, toda vez que las determinaciones de hechos de dicha resolución no están sostenidas por la prueba desfilada, tanto oral como documental; por consiguiente, no existe evidencia sustancial que sostenga las mismas lo que convierte las conclusiones de derecho en incorrectas y por ende también la decisión de la CIPA es incorrecta.

Erró la Comisión de Investigación, Procesamiento y Apelación al hacer determinaciones de hechos en la resolución cuya revisión se solicita, con abstracción de la prueba documental presentada en evidencia por la parte apelante-recurrente."

Luego de otorgarle término adicional, la Policía, representada por el Procurador General, presentó su oposición el 31 de mayo de 2005.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

## II

Como se sabe, la facultad revisora de los tribunales a las decisiones emitidas por una agencia administrativa es limitada. *"El alcance de la revisión judicial comprende tres áreas. Ellas son: (1) Concesión del remedio apropiado, (2) Revisión de las determinaciones de hechos conforme al criterio de evidencia sustancial, y (3) Revisión completa y absoluta de las conclusiones de derecho".* Demetrio Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme,* 2da. ed., Bogotá, Forum, 2001, pág. 534.

La función revisora del tribunal, aunque restringida, tiene como propósito fundamental el delimitar la discreción de los organismos administrativos, además de velar porque sus actuaciones sean conformes a la ley y estén dentro del marco del poder delegado. *T-JAC Inc. v. Caguas Centrum Limited,* 148 D.P.R. 70, 80 (1999); *Misión Ind. P.R. v. J.P.,* 146 D.P.R. 64, 129 (1998); *Misión Ind. P.R. v. J.P. y A.A.A.,* 142 D.P.R. 656 (1997).

Este ejercicio por parte del tribunal está enmarcado en dos principios fundamentales que postula la Ley Núm. 170 de 12 de agosto de 1988, conocida como Ley de Procedimiento Administrativo Uniforme (en adelante, L.P.A.U.). 3 L.P.R.A. § 2101 *et. seq. "Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo".* 3 L.P.R.A. § 2175. Sin embargo, *"[l]as conclusiones de derecho serán revisadas en todos sus aspectos por el tribunal." Id.* Es por tanto indispensable que la agencia realice determinaciones de hechos y conclusiones de derecho que puedan proporcionar a los tribunales la base en la que descansó la decisión del organismo administrativo. De esta forma, los tribunales estarán en posición de descargar su función revisora responsablemente.

El criterio rector en la revisión judicial de una determinación de hechos de una agencia es la existencia de evidencia sustancial. A estos fines, se ha definido evidencia sustancial como *"aquella [evidencia] pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión".* *Ramírez v. Depto. de Salud,* 147 D.P.R. 901, 905 (1999); *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.,* 144 D.P.R. 425, 437 (1997); *Hilton Hotels v. Junta Salario Mínimo,* 74 D.P.R. 670, 687 (1953). Se ha reconocido la norma jurisprudencial de que, de ordinario, los tribunales no intervendrán en las determinaciones de hechos de las agencias, mientras exista evidencia sustancial en apoyo de las mismas. *Pacheco Torres v. Estancias de Yauco, S.E.,* **2003 J.T.S. 148**; *Reyes Salcedo v. Policía de P.R.,* 143 D.P.R. 85, 109 (1997). Dicho análisis requiere que la evidencia sea considerada en su totalidad, incluyendo tanto aquélla que sostenga la decisión administrativa como también la que menoscabe el peso que la agencia le haya conferido. *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra,* pág. 437. Esta norma persigue evitar que los tribunales sustituyan el criterio de la agencia en asuntos enmarcados en su destreza y especialización por el criterio del tribunal revisor.

Para sostener la posición de que no existe evidencia sustancial que apoye las determinaciones de la agencia administrativa, la parte afectada debe demostrar que existe *"otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda concienzudamente concluir que la evidencia sea sustancial, en vista de la prueba presentada [...] y hasta el punto que se demuestre claramente que la decisión [de la agencia] no está justificada por una evaluación justa del peso de la prueba".* *Metropolitan S.E. v. A.R.P.E.,* 138 D.P.R. 200, 213 (1995). La prueba ofrecida deberá desfavorecer la presunción de que la determinación del organismo administrativo se desprende de la totalidad de la prueba que éste tuvo ante su consideración. *Ramírez v. Depto. de Salud, supra; Chase Manhattan v. Emmanuelli Bauzá,* 111 D.P.R. 708 (1981).

En cuanto a las determinaciones de derecho de la agencia, el tribunal podrá revisarlas en todos sus aspectos, aunque observando un nivel de deferencia por el criterio de la agencia en aquella legislación que ésta implante. *Rebollo Vda. de Liceaga v. Yiyi Motors,* **2004 J.T.S. 4**; *Oficina de Ética Gubernamental v. Román González,* **2003 J.T.S. 74**; *Puerto Rico Telephone Co. v. Junta,* 151 D.P.R. 269 (2000). Esta norma no presupone que el tribunal revisor pueda descartar libremente las interpretaciones o conclusiones de la agencia administrativa, sino

que les dará deferencia en la medida que éstas sean razonables. *Misión Ind. de P.R. v. J.P., supra*, a la pág. 132. Por tanto, el tribunal revisor sostendrá las conclusiones de la agencia mientras las mismas sean cónsonas con el propósito legislativo y no sean arbitrarias, ilegales o irrazonables. *Id.; T-JAC Inc. v. Caguas Centrum Limited, supra,* 80.

Recientemente, en *Otero Mercado v. Toyota de Puerto Rico Corp.*, **2005 J.T.S. 13**, el Tribunal Supremo resumió la doctrina vigente en torno a la deferencia reconocida a la decisión de una agencia administrativa. Señaló que la referida deferencia solamente cede en las siguientes circunstancias: (1) cuando no está basada en evidencia sustancial; (2) cuando el organismo administrativo ha errado en la aplicación de la ley; y (3) cuando ha mediado una actuación irrazonable o ilegal. Si el tribunal no se encuentra ante alguna de estas situaciones, aunque exista más de una interpretación razonable de los hechos, debe sostener la que seleccionó la agencia encargada. *Id.*

De otro lado, *"se denomina al proceso decisorio administrativo como uno de carácter institucional"*. Demetrio Fernández Quiñónez, *op.cit.*, pág. 185. Esto significa que es *"producto de toda una gestión burocrática y no de una persona o pequeño grupo fácilmente identificable"*, *op.cit.*

El Tribunal Supremo de Puerto Rico ha reconocido el carácter institucional de las decisiones administrativas. Nuestro más Alto Foro ha resuelto que *"[l]a norma de 'debido proceso de ley' no tiene en el campo del derecho administrativo la rigidez que se le reconoce en la esfera penal [citas omitidas]. La decisión administrativa es institucional en el sentido de que es la decisión de una agencia u organismo, y no la de un individuo ni la de los jefes de la propia agencia [...]. En el proceso administrativo la prueba se practica ante un examinador, éste u otro subalterno pueden cernir la evidencia, especialistas en diversas disciplinas del personal de la agencia pueden contribuir a la redacción de informes finales; y el jefe de agencia, como cuestión de realidad, puede descansar tan pesadamente en el trabajo de esos subalternos al extremo de conocer poco o nada de los problemas presentes en muchos de los casos que se resuelven en nombre de la agencia."* A. D.C.V.P. v. Tribunal Superior, 101 D.P.R. 875, 882 (1974).

En cuanto a las decisiones tomadas por las agencias administrativas, una mera alegación de parcialidad o prejuicio no es suficiente para sostener una reclamación de violación del debido proceso de ley, ya que para ello se requieren alegaciones fácticas específicas que indiquen parcialidad o prejuicio. *Henríquez v. Consejo Educación Superior,* 120 D.P.R. 194, 210 (1987). Por tanto, se ha reconocido que imputaciones de este tipo no deben descansar meramente en conclusiones, debido a que las decisiones de un organismo administrativo tienen a su favor una presunción de regularidad y corrección. *Id.*

Por otra parte, *"[e]l hostigamiento sexual es un problema de incomparable gravedad en el ámbito laboral. Atenta contra la dignidad del ser humano y muy particularmente contra la de la mujer, quien es la persona más afectada por esta conducta, debido a los patrones culturales existentes. La implantación efectiva de la política pública contra él y de las leyes y los reglamentos que la encarnan es de vital importancia en nuestra sociedad."* Srio. del Trabajo v. G.P. Inds., Inc., 153 D.P.R. 223, 263-264 (2001).

La Ley Núm. 17 de 22 de abril de 1988 ■ define al hostigamiento sexual en el empleo como *"cualquier tipo de acercamiento sexual no deseado, requerimiento de favores sexuales y cualquier otra conducta verbal o física de naturaleza sexual, cuando se da una o más de las siguientes circunstancias:*

*(a) Cuando el someterse a dicha conducta se convierte de forma implícita o explícita en un término o condición del empleo de una persona.*

*(b) Cuando el sometimiento o rechazo a dicha conducta por parte de la persona se convierte en fundamento para la toma de decisiones en el empleo o respecto del empleo que afectan a esa persona.*

*(c) Cuando esa conducta tiene el efecto o propósito de interferir de manera irrazonable con el desempeño del trabajo de esa persona o cuando crea un ambiente intimidante, hostil u ofensivo. 29 L.P.R.A. § 155b.*

Es norma reiterada que la creación de un ambiente hostil mediante hostigamiento sexual puede, por sí sólo, servir de fundamento para una reclamación por discrimen por razón de sexo. *Rodríguez Meléndez v. Supermercados Amigo, Inc., supra,* pág. 128, citando a *Henson v. City of Dundee,* 682 F. 2d. 897 (11mo Cir. 1982).

En el hostigamiento por ambiente hostil, existe una conducta de tipo sexual que interfiere irrazonablemente con el desempeño del empleado(a) o es lo suficientemente severa como para crear un ambiente intimidante y ofensivo. Para establecer un caso *prima facie* al tenor de esta modalidad, *"basta con que el hostigamiento se dirija a la víctima únicamente por razón de su sexo; no es necesario que la conducta sea explícitamente sexual ni que le cause un menoscabo económico al empleado afectado. Más bien, lo determinante para el éxito de una reclamación formulada al amparo de esta modalidad, es que la conducta hostigante —la cual, dicho sea de paso, no puede consistir de un incidente aislado—, haya causado tal grado de ansiedad y debilitamiento de la estima y confianza propias del [la] demandante que sus condiciones de empleo se hayan contaminado impermisiblemente."* (Citas omitidas). *Arcadio Afanador Irrizary v. Roger Electric,* **2002 J.T.S. 62**, pág. 1023, 156 D.P.R. ___ (2002); Véase además, *In re: Robles Sanabria,* **2000 JTS 106**; 151 D.P.R. ___ (2000). Así pues, el tribunal viene obligado a realizar un examen de la totalidad de las circunstancias dentro de las cuales surge la reclamación por ambiente hostil, a los fines de determinar si la conducta alegada constituye hostigamiento sexual. *Id.*

Asimismo, la Policía aprobó su Reglamento de Personal, núm. 4216, de 3 de julio de 1981 (el Reglamento de Personal) con el propósito de propiciar el desempeño eficiente de las funciones asignadas a dicho cuerpo. Dicho reglamento contiene además *"[l]as reglas que rigen a la Policía, promulgadas por el Superintendente, [que] establecen la conducta que deben observar sus miembros y también particularizan aquélla que se desvía de sus deberes, funciones y responsabilidades".* *Reyes v. Salcedo v. Policía de P.R.* 143 D.P.R. 85, 103 (1997).

En su Artículo 14 sección 3, el Reglamento de Personal dispone las medidas correctivas que el Superintendente de la Policía puede imponer a cualquier miembro de la Policía que incurra en alguna falta grave. Éstas son: la expulsión permanente del Cuerpo y la degradación o suspensión del Cuerpo, sin sueldo, por un período no mayor de cinco (5) meses. Asimismo, establece lo siguiente:

*"Sección 14.5 Identificación de Faltas*

*Se consideran faltas graves las siguientes:*

*1. Demostrar incapacidad manifiesta, ineptitud, descuido, parcialidad o negligencia en el desempeño de sus deberes, funciones y responsabilidades.*

*[...]*

*27. Observar una conducta lesiva, inmoral o desordenada en detrimento del Cuerpo de la Policía.*

*[...]*

*40. Incurrir en mal uso o abuso de autoridad, entiéndase como actos de mal uso o abuso de autoridad los siguientes:*

*[...] d. Discrimen por razones políticas, religiosas, condición socioeconómica, o cualesquiera otras razones no*

*aplicables a todas las personas en general."*

Finalmente, la CIPA fue creada mediante la Ley Núm. 32 de 22 de mayo de 1972, según enmendada, 1 LPRA sec. 171 *et seq.*, con el propósito de establecer un foro exclusivo para apelar los casos en que se encontrara incurso en mal uso o abuso de autoridad a cualquier empleado de la Rama Ejecutiva facultado para realizar arrestos. *Arocho v. Policía de P.R.*, 144 DPR 765 (1998).

Posteriormente, la Ley Núm. 32, *supra*, fue enmendada por la Ley Núm. 23 de 16 de julio de 1992, 1 LPRA sec. 172, con el fin de reconocer la jurisdicción apelativa exclusiva de la CIPA sobre los siguientes aspectos, a saber: (i) sanciones impuestas por la autoridad nominadora en respuesta a una imputación de mal uso o abuso de poder, y (ii) medidas disciplinarias impuestas con relación a la comisión de faltas leves o graves al Reglamento de la Policía o de otros foros administrativos que tengan reglamentaciones análogas. 1 LPRA sec. 172(2); *Ramírez v. Policía de Puerto Rico*, 158 DPR ___ (2002), **2003 JTS 3**. La CIPA tiene la autoridad expresa en ley para confirmar, revocar o modificar la determinación apelada, o inclusive para imponer cualquier sanción que el organismo facultado para sancionar hubiese podido a bien imponer en primera instancia.

En el Artículo 24 de su Reglamento núm. 5543 de 29 de enero de 1997, la CIPA ha dispuesto que las vistas administrativas a ser celebradas por ésta estarán constituidas por tres o más miembros y que para tomar acuerdos, es necesario un quórum de un mínimo de tres comisionados.

### III
Por estar íntimamente relacionados, discutiremos los primeros tres errores señalados en conjunto.

Arguye el recurrente que el hecho de que la CIPA hubiese fraccionado la celebración de la vista administrativa y que la prueba de la Policía fuera recibida por tres comisionados distintos a los que recibieron la prueba del recurrente, tuvo el efecto de violarle el debido proceso de ley. Por su parte, la Policía alega que no existe un impedimento constitucional que prohíba que la CIPA fraccione sus procedimientos. Tiene razón la recurrida.

Como mencionáramos, las decisiones administrativas tienen carácter institucional por lo cual se sostienen independientemente de que la prueba haya sido evaluada por distintos funcionarios y aun cuando la decision final sea tomada por alguna persona que no haya tenido contacto directo con la misma.

Surge del récord ante nos, que los tres comisionados que dirigieron los primeros dos días de la vista administrativa y que, por ende, escucharon en directo el testimonio de los testigos presentados por la Policía fueron sustituidos por tres nuevos comisionados. Estos fueron los que, al cabo de unos seis (6) meses, escucharon la mayoría de los testimonios de los testigos presentados por el Sr. Batista y quienes, en última instancia, tomaron la decision recurrida.

El recurrente alega que el tiempo transcurrido entre la primera parte de la vista administrativa y la segunda parte impidió que el testimonio de la Agte. Bauzá fuera debidamente refutado por sus testigos. Sin embargo, surge de la transcripción de la vista de 10 de junio de 2003 que la razón por la cual la vista tuvo que ser suspendida hasta enero de 2004 fue precisamente por el alto número de testigos que el recurrente quiso presentar. El propio abogado del Sr. Batista estuvo de acuerdo con tal suspensión y no expuso oposición alguna a la misma. ■ Además, el Agte. Fernández, testigo de refutación citado por el Sr. Batista para impugnar lo declarado por la Agte. Bauzá, no pudo declarar con anterioridad a marzo de 2004 porque, entre otras cosas, el propio recurrente desconocía su paradero. ■

Hemos visto que la jurisprudencia es clara en cuanto a que el funcionario que toma la decisión final en un proceso administrativo no tiene necesariamente que haber tenido un contacto directo con la prueba, siempre y

cuando eso lo haya hecho algún funcionario delegado para ello. Ciertamente, en el caso de autos no hubo tal delegación, dada la naturaleza del proceso adjudicativo de la CIPA, el cual es dirigido por los tres comisionados. Sin embargo, en caso en que tales comisionados no puedan, por razón alguna, continuar laborando para la CIPA, es razonable esperar que los mismos sean sustituidos por otras personas. Tal sustitución no puede suponer una paralización ni un atraso en los trabajos de dicha Comisión. No hallamos norma legal alguna que impida que tres nuevos comisionados en la CIPA puedan aquilatar la prueba desfilada y los testimonios desfilados en una vista administrativa dirigida por otros comisionados. Según nuestra normativa vigente, lo esencial es que la decisión tomada por la CIPA sea una informada y basada en la evidencia sustancial en el expediente administrativo. Además, surge de la transcripción de la vista administrativa celebrada el 14 de enero de 2004 que el abogado del Sr. Batista manifestó su conformidad con que los procedimientos continuaran de manera fraccionada. ■

Por otra parte, cabe señalar que si a alguna persona le benefició el fraccionamiento de la vista administrativa, ésta fue al Sr. Batista, puesto que los tres comisionados que finalmente tomaron la decisión recurrida solamente escucharon en directo a los más de 20 testigos presentados por el recurrente.

No se cometieron los primeros tres errores señalados.

El cuarto y quinto error señalados requieren que evaluemos si existe evidencia sustancial en el expediente administrativo que sostenga la resolución recurrida.

Arguye el recurrente que las determinaciones de hechos de la CIPA fueron controvertidas por los testigos que presentó en la vista administrativa. En específico, el recurrente sostiene que los testimonios de la Agte. Feliciano y del Agte. Fernández refutaron lo declarado por la Agte. Bauzá en cuanto al incidente acaecido el 25 de octubre de 1999. Por su parte, la Policía alega que la prueba vertida ante la CIPA recoge varias instancias en las que el Sr. Batista hizo insinuaciones de alto contenido sexual a la Agte. Bauzá y, además, incurrió en un acto de agresión física de índole sexual que valida su expulsión del cuerpo policiaco. Tiene razón la recurrida.

Surge del récord ante nos que la Agte. Bauzá narró con especificidad cómo en tres incidentes diferentes fue objeto de acercamientos sexuales por parte del Sr. Batista estando a solas con éste. Entre tales acercamientos, la Agte. Bauzá declaró cómo en una ocasión le preguntó al recurrente si podía utilizar pantalones en sus horas laborables y éste le respondió que sí, pero que velara porque *"no fueran ajustados o muy apretados, ya que lo de él no se exhibía"*. ■ En otra ocasión, el Sr. Batista le encomendó que hiciera una llamada telefónica en su oficina. Mientras la Agte. Bauzá realizaba tal llamada, el recurrente le manifestó que *"se sentía como Igor González con su propia Olga Tañón"*, ■ mientras le miraba sus partes íntimas y se mojaba los labios. Posteriormente, el Sr. Batista le preguntó a la Agte. Bauzá cómo se sentía y al ésta responderle que bien, el recurrente respondió que *"cuando [s]e fuera a portar mal, [s]e acordara de él porque [...] quería ser el primero en poner[la] a gozar"*. ■

Todos estos incidentes se dieron, según lo declarado por la Agte. Bauzá, estando a solas con el Sr. Batista. Por tal razón, el recurrente era la única persona capaz de controvertir dicho testimonio. Sin embargo, éste decidió no brindar declaración alguna ante la CIPA. Vemos tal decisión con sospecha. El Sr. Batista no puede pretender que tal foro administrativo le brinde a su silencio mayor credibilidad que a lo declarado bajo juramento por la Agte. Bauzá en la vista administrativa. Así pues, el testimonio de la recurrente en cuanto a los tres mencionados incidentes no fue controvertido en momento alguno por el Sr. Batista.

Por otro lado, la Agte. Bauzá declaró cómo el 25 de octubre de 1999, *"en horas de la tarde"*, ■ mientras conversaba con el retén, el Sr. Batista pasó detrás de ella y la rozó con su órgano sexual erecto por lo cual ella intentó abofetearle, pero fue detenida por el Agte. Pacheco. Este agente también declaró en la vista administrativa y corroboró en su totalidad lo declarado por la Agte. Bauzá con relación al mencionado

incidente. ■

Por último, la Agte. Bauzá declaró que, a raíz de los incidentes señalados, le comunicó a uno de sus supervisores, el Coronel Rodríguez, que no se sentía cómoda en su lugar de trabajo, que *"no [se] encontraba en condiciones de seguir allí"* por lo cual quería un traslado. ■

Con el propósito de refutar tanto el testimonio de la Agte. Bauzá como del Agte. Pacheco, el recurrente presentó a los dos agentes que se desempeñaban como retenes, en turnos diferentes, el 25 de octubre de 1999. La Agte. Feliciano (quien tenía el turno de ocho de la mañana a las cuatro de la tarde) declaró que en el aludido día no vio en momento alguno a la Agte. Bauzá en el área del retén ni tampoco la vio en compañía del Sr. Batista. ■ Por su parte, el Agte. Fernández (cuyo turno comenzaba a las cuatro de la tarde) declaró que el 25 de octubre no había visto *"nada que le llamara la atención"* ■ en el área del retén. Como parte de su interrogatorio, el abogado del recurrente le expresó al Agte. Fernández que la Agte. Bauzá había declarado ante la CIPA que el día 25 de octubre de 1999, dicho agente le detuvo su brazo cuando ella intentó abofetear al Sr. Batista. Esto fue negado por el Agte. Fernández. ■ Sin embargo, cabe señalar que del testimonio de la Agte. Bauzá surge que la persona que le detuvo su brazo fue el Agte. Pacheco. El Agte. Fernández corroboró con su testimonio que el Agte. Pacheco sí se encontraba en el área del retén cuando alegadamente ocurrió el incidente narrado por la Agte. Bauzá.

De otro lado, alega el recurrente que el resto de los testimonios que presentó en la vista administrativa desmintieron lo declarado por la Agte. Bauzá. No obstante, surge de la transcripción de la aludida vista que los testigos del Sr. Batista centraron sus declaraciones en dos elementos: 1) el carácter de la Agte. Bauzá, y 2) la alegada oferta económica que ésta le hiciera a un tal Agte. Molina para que declarara en contra del Sr. Batista. El Sgto. Torres declaró que la Agte. Bauzá *"gustaba [de] hacer muchas bromas de índole sexual con los compañeros"*. ■ Por su parte, el Sr. Vega declaró que el Agte. Molina le comunicó que la Agte. Bauzá le ofreció dinero para que declarara en contra del Sr. Batista. ■ Sobre este último asunto, el recurrente presentó el testimonio de los Agentes Norman Torres y Juan Martínez, así como el del Sgto. Carlos R. Santos que declararon lo mismo que el Sr. Vega. Cabe señalar que el Agte. Molina fue un testigo renunciado por la Policía y puesto a la disposición del Sr. Batista. Sin embargo, el recurrente no lo utilizó como testigo, esto a pesar de que gran parte de los testimonios que ofreció en la vista administrativa tenían que ver con lo supuestamente dicho por él.

Finalmente, el Sr. Batista presentó como prueba la lista de asistencia de los agentes que se presentaron a trabajar el 9 de noviembre de 1998 al Precinto 258 de la Playa de Ponce. De ésta se desprende que la Agte. Bauzó entró a trabajar a las ocho de la mañana, lo cual es cónsono con lo declarado por ella en la vista administrativa. ■ Para refutar dicho hecho, el Sr. Batista presentó el testimonio del Agte. Walter García Ferrer, quien declaró que, en el aludido día, la Agte. Bauzá obtuvo su entrada mediante una llamada telefónica por lo cual alegadamente nunca estuvo en el cuartel.

Surge de la resolución recurrida que la CIPA le dio completa credibilidad al testimonio vertido por la Agte. Bauzá, el cual fue corroborado por otros testigos. Los esfuerzos del Sr. Batista para menoscabar la credibilidad del testimonio de la Agte. Bauzá giraron en torno a la conducta alegadamente sexual que ésta desplegaba ante sus compañeros de labores. Sin embargo, aun tomando como cierta tal conducta, el recurrente no logró probar cómo la misma justificaba los avances sexuales que le hiciera a su subalterna sin ser deseados por ella al grado tal que le afectó sus condiciones de trabajo.

Siendo un asunto que envuelve la credibilidad de los testigos y estando los Comisionados de la CIPA en mejor posición para observar, escuchar y apreciar las declaraciones de éstos, concedemos deferencia a sus determinaciones. El recurrente falló en rebatir la presunción de corrección y la deferencia que cobija a toda decisión administrativa. Por tal razón, concluimos que existe evidencia sustancial en el récord administrativo

que sostiene la expulsión del recurrente. No se cometieron los errores cuarto y quinto señalados.

Al tenor del análisis que antecede, procede confirmar la resolución recurrida.

**IV**

Por los fundamentos antes expuestos, se confirma la resolución emitida por la Comisión de Investigación, Procesamiento y Apelación el 30 de marzo de 2004 y notificada el 18 de mayo de igual año.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal Interina.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones